**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAIME VALDEZ,

Defendant - Appellant.

No. 25-2053

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CR-00562-JB-1)**

---

Amanda Skinner, Assistant Federal Public Defender (Margaret A. Katze, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of New Mexico, Las Cruces, New Mexico, for Defendant-Appellant.

Fred J. Federici, Assistant United States Attorney, District of New Mexico, (Todd Blanche, Attorney General; Ryan Ellison, First Assistant United States Attorney and James R.W. Braun, Assistant United States Attorney, on the brief), Office of the United States Attorney for the District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **HARTZ**, **EID**, and **ROSSMAN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Defendant Jaime Valdez was convicted by a jury on one count of possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), (b)(1)(A), one

count of possessing a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i), and one count of being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1), 924. He appeals the district court's denial of his motion to suppress the drugs and firearm that formed the basis for his conviction, arguing that these items were seized as the result of an unlawful stop, frisk, and search of a duffel bag. Defendant also argues that the district court should not have reconsidered and reversed course on its earlier suppression of the items found in the duffel bag after the court received supplemental exhibits from the government indicating that the contents of the duffel bag would have been inevitably discovered. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The stop was lawful and items discovered in the frisk and the search of the duffel bag would have inevitably been discovered. And the district court had authority to reconsider interlocutory rulings before it entered final judgment.

## I. BACKGROUND

### A. Factual Background

"Generally, when reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the determination of the district court." *United States v. Guzman*, 149 F.4th 1132, 1140 (10th Cir. 2025) (internal quotation marks omitted). On the morning of February 20, 2021, Defendant knocked on the door of a house located in a high-crime area of Albuquerque known as the South Valley. He asked the woman who answered if he could retrieve a duffel bag that he had thrown in her yard the night before. She grabbed the bag and gave it to him. But after

noticing that Defendant was still loitering in the area several hours later, the woman called the police. Deputies Anthony McLeod and Bradley Denger of the Bernalillo County Sherriff's Office (BCSO) were patrolling in the area and received a dispatch regarding a suspicious male who appeared to be casing the neighborhood. The man was described as "Hispanic . . . approximately in his 20s, wearing a gray top and black pants, with a duffel bag." R., Vol. I at 325. The deputies, who were driving separate vehicles, were dispatched to the address of the caller. When they did not see a suspect at first, McLeod telephoned the caller, who told him that the man had explained to her that "he was running from someone last night and threw his duffel bag over her fence into her backyard." *Id.* at 113 (internal quotation marks omitted).

The deputies then spotted a man who matched the description in the dispatch and was carrying a duffel bag. The man, later identified as Defendant, was peering through the window of an unoccupied car for sale. McLeod testified that the man "did have a duffel bag on his person" and that he and Denger "didn't know if there were burglary tools or anything like that. And with already the nature of the call that [they] were originally out for, [they] just wanted to check on the subject and see if everything was okay." *Id.* at 289–90. McLeod drove toward Defendant, who was reaching into his duffel bag. Because Defendant was "looking around nervously, shifting his body weight," *id.* at 327, Denger was concerned that Defendant may try to flee, so he drove his vehicle around to block off a potential escape route.

McLeod got out of his vehicle and approached Defendant, who was bent over and reaching into the bag, which was on the ground. McLeod instructed him to stop

reaching into the bag. Defendant picked up the bag. McLeod once again ordered Defendant not to reach into the bag, at which point Defendant dropped the bag on the ground. McLeod instructed and gestured for Defendant to keep his hands up, but Defendant instead reached into his pocket, pulled out a cellphone, and gestured toward the car for sale. Defendant repeatedly stated that he had done nothing wrong and refused to put his hands on his head despite being ordered to do so. McLeod began a pat-down but stopped midway through to handcuff Defendant because he "began to tense up." *Id.* at 293. Defendant became upset and said that he was in pain as McLeod tried to handcuff him. After he was handcuffed, he gave Denger his date of birth and social security number.

As Denger walked back toward his patrol car with the duffel bag to place it on the hood of his car and to check whether Defendant had a criminal record, McLeod continued the pat-down. He found a magazine in Defendant's right pocket, found a pistol in his left pocket, and found $2,560 in cash on Defendant's person. McLeod told Defendant that he was being detained and took him to his patrol car. Denger meanwhile ran Defendant's information through the National Crime Information Center (NCIC) database, which revealed three felony warrants for Defendant's arrest. He immediately informed McLeod about these warrants. McLeod then read Defendant *Miranda* warnings. While McLeod questioned Defendant, Denger searched the duffel bag and found methamphetamine, a scale, and drug paraphernalia. The deputies took Defendant to the BCSO substation, where Denger tagged the drug

paraphernalia into evidence. McLeod filled out an Incident Report listing as Defendant's property the pistol, magazine, cash, methamphetamine, and other items.

### B. Procedural History

Defendant moved to suppress "all evidence obtained during the search of his person and the search of the bag." Aplt. Br. at 5. He made several arguments, including, as relevant here, that the stop and pat-down were illegal and that the search of the duffel bag was not supported by probable cause or a warrant. The government countered that both the initial stop and the pat-down were lawful, that the search of the duffel bag was a lawful inventory search, and that the items in the bag would have been inevitably discovered during an inventory search. It also argued that the firearm would have been inevitably discovered during a search incident to arrest once the deputies learned of the outstanding warrants.

At an evidentiary hearing on February 4, 2022, the district court indicated that it was inclined to deny Defendant's motion to suppress. At a later pretrial conference, however, the court said that it was "changing its . . . oral ruling on the motion to suppress and granting it in part and denying it in part." R., Vol. III at 638 (Tr. of April 25, 2022 Hr'g). Although the court still thought that the stop and frisk were lawful, it stated that the search of the duffel bag "was not a lawful inventory search," *id.* at 635, and that the "contents of [Defendant's] bag would not have been inevitably discovered by a warrant or exigent circumstances, or an inventory search." *Id.* at 636. The court stated:

> Mr. Denger testified it was a search incident to arrest. So the officers were not testifying that it was an inventory search. Neither deputy testified that they performed an inventory search. No inventory sheet was produced. There is no indication that either deputy did an inventory search later on, just that they tagged the contents of [Defendant's] bag into evidence.

*Id.* Though it would not have a written opinion out for "a couple more days," the court said that it was "pretty satisfied" that it would suppress the evidence found in the duffel bag. *Id.* at 637.

The next day the government filed a Notice of Supplemental Exhibits, explaining that it had not "perceive[d] the proof of an inevitable inventory at [the detention center] to have been an issue until the Court's remarks at the pretrial hearing." R., Vol. I at 276. It submitted four exhibits: a transcript of McLeod's and Denger's testimony at the February 4 suppression hearing, the detention center's policy for the inventory of inmate's property, the property list for Defendant, and an incident report documenting items that were tagged into evidence. Defendant moved to strike the notice as an untimely attempt to present evidence that could have been presented earlier. *See id.* at 393–94.

The district court held another hearing on May 2, 2022. It stated that it would treat the government's Notice as a motion to reconsider, and, once again, the court changed course. It indicated that it would now deny the motion to suppress the duffel-bag evidence because the new exhibits made it "more difficult for [the court] to say either, A, there was no inventory search, or B, [the evidence] would not have inevitably been discovered by Bernalillo County Sheriffs or personnel at the detention facility when they looked at [Defendant's] personal effects." Supp. R. at 9–

10 (Tr. of May 2, 2022 Hr'g.). The court advised that after it issued its written opinion, Defendant could "decide whether he wants to give us any more evidence or try to get more evidence." *Id.* at 31–32.

Two days later the district court filed a memorandum opinion and order construing the government's Notice of Supplemental Exhibits as a motion for reconsideration and denying Defendant's motion to strike it. Quoting *United States v. Huff*, 782 F.3d 1221, 1222 (10th Cir. 2015), the court said that it could reconsider a motion to suppress "'without requiring the government to justify why it initially failed to set forth [its present] legal basis for the seizure of evidence.'" *United States v. Valdez*, 685 F. Supp. 3d 1110, 1205 (D.N.M. 2023). Because the exclusionary rule was crafted to "'deter illegal police searches and seizures,'" not to deter "'judicial or prosecutorial error or oversight,'" the court saw "no benefit in ignoring the United States' Supplemental Notice and attached exhibits." *Id.* at 1206 (quoting *Huff*, 782 F.3d at 1225). After all, "'[t]o categorically prohibit the district court from reconsidering [the] suppression of evidence under those circumstances serves merely to punish the government for its attorneys' oversight.'" *Id.* (quoting *Huff*, 782 F.3d at 1225).

Considering both the new exhibits and the evidence that had previously been brought to its attention, the court denied Defendant's motion to suppress in its entirety. *See id.* at 1217–23, 1227. It held that the deputies had reasonable suspicion to stop and detain Defendant under *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968), noting that "[t]hrowing a bag into a stranger's yard is suspicious activity in and of itself."

*Valdez*, 685 F. Supp. 3d at 1206. That behavior, paired with Defendant's "nervous appearance, his behavior peering into the window of an unoccupied car, . . . his reaching into the duffel bag," and the fact that all this occurred in a high-crime area, together gave rise to reasonable suspicion. *Id.* at 1207. The court also held that the deputies could reasonably suspect that Defendant was armed and dangerous, justifying the pat-down. *See id.* at 1208–09. Finally, although the court said that the search of the duffel bag was unlawful because it was not a search incident to arrest or an inventory search, *see id.* at 1212–17, it held that the government proved by a preponderance of the evidence that the contents of the bag would have been inevitably discovered during a "hypothetical, valid inventory search" before Defendant was booked at the jail. *Id.* at 1217.

## II. DISCUSSION

On appeal Defendant argues that the stop and frisk were unlawful. He further argues that the district court plainly erred by construing the government's Notice as a motion to reconsider. Alternatively, if it was proper for the court to treat the Notice as a motion to reconsider, Defendant argues that the court abused its discretion in considering and granting it.

### A. The Stop

On appeal from a denial of a motion to suppress, "we review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment, but we accept the district court's factual findings unless they are clearly erroneous and we view the evidence in the light most favorable to the prevailing

party." *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012). An investigatory stop "is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has [committed] or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (internal quotation marks omitted). "Although reasonable suspicion requires the officer to act on something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." *Id.* at 1255–56 (brackets, citations, and internal quotation marks omitted). The court "need not rule out the possibility of innocent conduct" because "reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *Id.* at 1256 (internal quotation marks omitted). Officers may have reasonable suspicion even if the tip they received "fails to allege criminal activity and [they] do not observe any illegal conduct." *United States v. Conner*, 699 F.3d 1225, 1231 (10th Cir. 2012). The test is an objective one, although we can defer to the expertise and experience of the officers. *See McHugh*, 639 F.3d at 1256. Presence in a high-crime area and a defendant's "nervous, evasive behavior" are both pertinent factors. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (officer's suspicion was based in part on fact that suspect fled upon noticing police).

Defendant contends that when the deputies spotted him he was engaged in the "innocent conduct" of looking at a vehicle for sale. Aplt. Br. at 11 (internal quotation marks omitted). He maintains that "[p]eople in high crime areas have the right to

both sell their vehicles and, as [Defendant] did, look at a vehicle for sale." Aplt. Reply Br. at 5. We agree with that proposition. But it does not help Defendant. We "look to the totality of the circumstances." *McHugh*, 639 F.3d at 1256 (internal quotation marks omitted). Defendant threw a duffel bag over the fence of a stranger's home in the night because he was being chased by someone. He retrieved it from the stranger the next morning and then loitered in the vicinity, a high-crime area, for several hours. He was observed at a for-sale car on the street while looking around nervously and reaching into the bag. Such abnormal behavior fully justified a brief police detention to determine what was going on. We reject Defendant's contention that the stop was not supported by reasonable suspicion.

### B. The Frisk

"During the course of a valid investigative detention, an officer may conduct a limited protective search (frisk) if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (internal quotation marks omitted). Defendant argues that no such suspicion existed here, and thus that the magazine, pistol, and cash found on his person should have been suppressed. But we need not determine whether the frisk was lawful because these items would have been inevitably discovered. We can affirm on this ground since the government raised it below and on appeal, giving Defendant ample opportunity to respond. *See Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015).

As a general rule, evidence obtained by law enforcement as a result of an unconstitutional search or seizure is not admissible at trial—it is suppressed under the exclusionary rule. But there are exceptions to the rule. The inevitable-discovery exception applies when the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. O'Neil*, 62 F.4th 1281, 1290 (10th Cir. 2023) (internal quotation marks omitted). If that exception applies, we need not determine whether there has been an unconstitutional search or seizure.

Here, the evidence supports a finding that the deputies would have run Defendant's information through the NCIC even if McLeod had not patted down Defendant. Denger obtained Defendant's date of birth and social security number *before* McLeod found the magazine or the pistol. And Denger testified that he had "stepped away to [his] patrol vehicle" because he was "going to attempt to run the information that [Defendant] had given [him] through a local law enforcement database and NCIC." R., Vol. I at 332. The NCIC search showed that Defendant had three felony arrest warrants.

Once the deputies learned of the arrest warrants, they had "an obligation to arrest" Defendant. *Utah v. Strieff*, 579 U.S. 232, 240 (2016). At that point it would have been lawful for the deputies to search Defendant's person incident to arrest. *See Riley v. California*, 573 U.S. 373, 384 (2014) (recognizing that a search of a suspect's person requires "no additional justification" when a custodial arrest is based on probable cause (internal quotation marks omitted)); *Strieff*, 579 U.S. at 241 (noting, in context of

attenuation exception to the exclusionary rule, that it was "undisputedly lawful" for officer to search suspect "as an incident of his arrest").

**C. The Duffel-Bag Search**

Although the district court held that the search of the duffel bag was neither a lawful search incident to arrest nor a lawful inventory search, it declined to suppress the items found in the bag because they would have been inevitably discovered during "a hypothetical, valid inventory search." *Valdez*, 685 F. Supp. 3d at 1217. That holding was primarily based on evidence that the government presented in its Notice of Supplemental Exhibits, which the court treated as a motion for reconsideration.

Defendant first argues that the district court plainly erred in construing the government's Notice as a motion to reconsider. Alternatively, he argues that the district court abused its discretion in granting reconsideration because the Notice did not "argue, let alone implicate, an intervening change in controlling law or argue new evidence that was previously unavailable." Aplt. Br. at 17. We disagree.

To begin with, the general rule is that courts characterize pleadings by their substance, not their caption. *See United States v. Griffith*, 928 F.3d 855, 876 (10th Cir. 2019). *But cf. Castro v. United States*, 540 U.S. 375, 377 (2003) (recognizing exception barring courts from recharacterizing a litigant's motion as a motion under 28 U.S.C. § 2255 without first explaining to litigant the consequences of such a recharacterization). It is clear that the government motion was asking the district court to reconsider a prior decision. That is enough. The Supreme Court firmly established this in *United States v. Dieter*, 429 U.S. 6 (1976) (per curiam). It wrote, "It is true that the government's post-

dismissal motion [filed by AUSA Hartz] was not captioned a 'petition for rehearing,' but there can be no doubt that in purpose and effect it was precisely that, asking the District Court to 'reconsider a question decided in the case' in order to effect an 'alteration of the rights adjudicated.'" *Id.* at 8–9 (brackets omitted) (quoting *Dep't of Banking, Neb. v. Pink*, 317 U.S. 264, 266 (1942)).

We also see no error in the district court's exercise of discretion to consider the motion on its merits. Defendant "acknowledges" that "'motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them.'" Aplt. Br. at 17 (brackets omitted) (quoting *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014)). But, citing *Huff*, Defendant contends that it is improper for a district court to grant such a motion absent specified circumstances. This contention not only reads too much into *Huff*, but it ignores the contrary holding of that opinion.

The *holding* in *Huff* is that a district court may correct a legal error in granting a motion to suppress when the error has been brought to its attention. The district court in that case had initially suppressed evidence of firearms that it thought had been seized unlawfully, but it reconsidered that ruling after the government introduced a city ordinance that provided a legal basis for the seizure. *See Huff*, 782 F.3d at 1223. Although "the government [had] provided no valid excuse" for failing to raise the ordinance in the first instance, we affirmed the district court's decision to reconsider its suppression ruling. *Id.* at 1224. To prohibit reconsideration, we said, would "punish the government for its attorneys' oversight," *id.* at 1225, contrary to

Supreme Court authority that the purpose of suppression is to deter errors committed by law-enforcement officers, not errors by prosecutors or judges. *See United States v. Leon*, 468 U.S. 897, 916 (1984).

To be sure, as part of our background discussion in *Huff* we cited our earlier opinion in *Servants of the Paraclete v. Does*, 204 F.3d 1005 (10th Cir. 2000), in which we affirmed a district court's denial of motions for relief from judgment under Fed. R. Civ. P. 60(b). Our opinion listed three grounds traditionally warranting reconsideration: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* at 1012.

Defendant argues that reconsideration was inappropriate here because the government did not point to any of the three grounds we identified in *Paraclete*. But we must be mindful of the context in which that case arose before we apply it here. In particular, *Paraclete* concerned *postjudgment* motions and we were reviewing the district court's decision to *deny* those motions. Here, in contrast, the motion was directed to an interlocutory matter before entry of final judgment, and the district court granted the motion. *Paraclete* could not have been saying that a district court would have no authority to grant such an interlocutory motion, because the Federal Rules are to the contrary. Fed. R. Civ. P. 54(b) states that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and

liabilities." This proposition was not a modern conception original to the Federal Rules. The rule recognizes an "inherent authority" that is "firmly rooted in the common law." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1380 (11th Cir. 2024). We might well hold that a district court does not abuse its discretion by *denying* an interlocutory motion for reconsideration (without addressing the merits) because the motion did not invoke one of the grounds stated in *Paraclete*. But the failure of the movant to invoke such a ground does not preclude the district court from reconsidering its earlier decision, changing its mind, and granting the motion. *See Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1361 (10th Cir. 2024) (noting that *Paraclete* is inapposite when reviewing a *prejudgment* motion for reconsideration).

Indeed, even when addressing postjudgment motions, almost all our published opinions invoking the absence of any of the *Paraclete* grounds for reconsideration are ones in which we *affirmed* the denial of the motion by the district court. And in the one case of which we are aware in which this court reversed the grant of a postjudgment motion for failure to provide a *Paraclete* ground, we emphasized that it was the movant's *second* postjudgment motion. *See Nelson v. City of Albuquerque*, 921 F.3d 925, 929–30 (10th Cir. 2019); *see also Nelson v. City of Albuquerque*, 925 F.3d 1187, 1196–98 (10th Cir 2019) (Bacharach, J., concurring in denial of rehearing en banc).

Although this circuit has little authority addressing motions for reconsideration in criminal trials, that authority supports a district court's inherent power to correct its own errors while it still has jurisdiction. We saw no difficulty, for example, when

a district court reconsidered its initial suppression of evidence simply because it had "mistakenly overlooked" or "misapprehended" the government's position that the evidence would have been inevitably discovered. *Christy*, 739 F.3d at 539–40; *see id.* (stating that a motion to reconsider "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier" but concluding that we "defer to the district court's discretion to correct its mistakes"). Nor did we take issue with the decision by the district court in *Huff* to reconsider a suppression ruling in light of a new legal argument that the government plainly could have raised in the first instance. *See Huff*, 782 F.3d at 1224. *Huff* did acknowledge that a small minority of circuits may have "require[d] the government to justify its failure" to present its new legal argument sooner. *Id.* But we declined to follow those circuits. *See id.* at 1224–25.

Finally, the little that has been said by the Supreme Court is supportive of district courts correcting error in criminal cases whenever they have jurisdiction. Justice Harlan invoked inherent judicial authority in an in-chambers opinion affirming a district court's decision to revoke bail that it had previously granted. *See Fernandez v. United States*, 81 S. Ct. 642, 644 (1961) (Harlan, J., in chambers). And in *Dieter*, 429 U.S. at 8, the Court said that the government had properly filed a motion for reconsideration shortly after dismissal of the indictment. The Court reversed the lower-court decisions holding that the district court lacked jurisdiction to consider the motion. It recognized the "wisdom of giving district courts the opportunity promptly to correct their own alleged errors." *Id.* Most recently, the

Court referenced *Fernandez* approvingly, giving it a "*see also*" signal in support of the proposition that "a district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case." *Dietz*, 579 U.S. at 46.

Thus, there is considerable authority that before entry of judgment the district court has discretion to correct any error it believes it has made in the course of criminal proceedings (absent double-jeopardy concerns). But we need not go that far to affirm in this case. Taking our cue from *Huff*, we can limit our holding to recognizing the district court's authority during pretrial proceedings to reconsider and set aside a prior ruling suppressing evidence. And here, the district court, considering the circumstances before it, saw "no benefit in ignoring" the government's supplemental exhibits. *Valdez*, 685 F. Supp. 3d at 1206. We discern no abuse of discretion in that determination.

Finally, we are unpersuaded by Defendant's brief argument that the district court erred in finding inevitability.

## III. CONCLUSION

We **AFFIRM** the ruling of the district court.